JOSEPH CURLE, Respondent, v BENJAMIN WARD, as Commissioner of the Department of Correctional Services of the State of New York, et al., Appellants.

Third Department, November 10, 1977

*Louis J. Lefkowitz,* Attorney-General *(Lawrence L. Doolittle* and *Ruth Kessler Toch* of counsel), for appellants.

*Rowley & Forrest, P. C. (Jeffrey G. Plant* of counsel), for respondent.

GREENBLOTT, J. P. Plaintiff commmenced this action as a proceeding pursuant to CPLR article 78. It was converted, under authority of CPLR 103, to an action for declaratory judgment and permanent injunction by order of Supreme Court, Albany County, entered December 10, 1975.

Plaintiff, Joseph Curle, served for six years as a correction officer at the Elmira Facility of the New York State Department of Correctional Services. Defendants do not allege that he performed those services in other than a competent and even-handed manner.

On September 2, 1975, defendant, Benjamin Ward, as Commissioner of the Department of Correctional Services, issued a

directive concerning employee membership in the Ku Klux Klan. The directive denounced the Klan and termed it a "threat to the productive administration, substantive programming and appropriate security" of its facilities. The directive also stated the department's awareness of the sensitive constitutional questions involved, and found that the inmates' inability to control their environment tips the balance in favor of the inmates' Eighth Amendment right to humane treatment and against the employees' First Amendment right of free association. The directive forbade membership in the Ku Klux Klan and ordered disassociation by October 1, 1975 under threat of "appropriate disciplinary action".

Plaintiff was summoned, on October 2, 1975, to appear before an executive deputy commissioner of the department. On advice of counsel, plaintiff refused to answer questions regarding his membership in the Klan and any activities outside his duties as a correction officer and off the grounds of the correctional facility. He answered questions concerning conduct within the facility.

On October 31, 1975, plaintiff received a notice of discipline dismissing him from service for the stated reasons that his refusal to answer questions at the October 2 interrogation constitutes insubordination and that he is a member of the Ku Klux Klan and, as such, is in violation of the September 2, 1975 directive. Plaintiff sought an injunction restraining the department from carrying out the dismissal or in any other way disciplining him for alleged membership in the Ku Klux Klan, and further sought a declaration that the September 2 directive is unconstitutional and void. Upon plaintiff's motion for summary judgment, Special Term granted the relief requested.

At issue is plaintiff's right to freely associate with whomever he pleases and the extent to which defendants may infringe upon that right. Although not specifically enumerated in the Constitution, freedom of association is now considered to be a fundamental right, implicit in the First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment *(Sheldon v Tucker,* 364 US 479). And, even though plaintiff has no right to public employment, he may not be discharged for the exercise of a constitutional right *(Perry v Sindermann,* 408 US 593; *Matter*

*of Lichtensteiger v Housing & Development Admin.,* 40 AD2d 810).

The exercise of First Amendment rights, particularly that of association, is not without limitation *(Civil Serv. Comm. v Letter Carriers,* 413 US 548). However, a significant abridgment of associational freedom cannot be justified upon a mere showing of a legitimate State interest *(Kusper v Pontikes,* 414 US 51, 58; *Bates v Little Rock,* 361 US 516, 524). The interest advanced must be compelling, one of vital importance to the State, and the burden is on the State to show the existence of such an interest *(Elrod v Burns,* 427 US 347, 362). The courts will closely scrutinize the State's claimed interest to determine if it outweighs the harm caused by the constitutional encroachment. Furthermore, even if the State should demonstrate a substantial interest, the State must seek to protect its interest using the least drastic means available causing the least injury to fundamental constitutional freedoms *(Kusper v Pontikes, supra,* p 59; *Shelton v Tucker, supra,* p 488).

It is clear even upon a cursory examination that the directive in question cannot meet the latter test. The directive bars all employees from membership in the Ku Klux Klan. Yet, taking the Department of Correctional Services' arguments at face value, only prison guards with membership in the Klan present a danger. Defendants offer no explanation why it is in the State's paramount interest to ban all other employees of the department.

Examining the directive as if it only applied to correction officers, we still find it constitutionally repugnant. Controlling on these facts is *United States v Robel* (389 US 258), in which the Federal Government brought a criminal indictment under a statute making it unlawful for any member of a Communist-action organization to work in any defense facility. The court recognized the substantial governmental interest in reducing the threat of sabotage and espionage in the Nation's defense plants, but noted that the means adopted to protect that interest cut deeply into the right of association. "The statute quite literally establishes guilt by association alone, without any need to establish that an individual's association poses the threat feared by the Government in proscribing it" *(id.,* p 265). The court concluded that it could not uphold a statute which bars employment for association which may not be proscribed consistently with First Amendment rights. The court did point out that the Government was not without remedy, and that a

statute tailored properly to the end to be achieved could pass constitutional muster.

In the case at bar, defendants seek to exclude all persons affiliated with the Ku Klux Klan, claiming that that affiliation is disruptive to prison administration and that it prevents the member from properly carrying out his functions. This argument suffers from the same infirmity as the Government's argument in *Robel*. It provides no room for examination of the nature of an employee's affiliation; what he believes to be the goals of the organization, to what extent he adheres to those goals, and to what extent his performance of correctional department duties is affected. Nor does the directive require the defendants to show that membership in the Klan poses the threat that they fear. It is "guilt by association", and in the area of First Amendment freedoms this cannot be countenanced.

The foregoing analysis makes scant mention of the nature of the State's interest in promulgating the directive; it, in effect, assumed a valid, compelling interest. Although we need not do so, we comment on the State's claimed interest for future guidance. We agree that the interests—maintaining proper prison security and protecting inmates from uneven treatment—are laudable and substantial. However, we are not certain that the proofs submitted in the affidavits adequately demonstrate the dangers that the defendants fear are threatening those interests, particularly in view of plaintiff's past unblemished record.

Supporting their claim that the Klan's presence in the correctional facilities will be disruptive, defendants offer three articles documenting the violent and racist history of the Klan. Even accepting the truth of the numerous allegations in those articles, more than a decade has passed since the articles were prepared, and more time still since the events portrayed took place. Further, none of the acts took place in this area. Are we to assume that the current New York chapters hold to the same ideals and will act in a similar manner? The inferential gap is too great. Absent proof of recent Klan activities within the region, we are unable to credit defendants' characterizations of the Ku Klux Klan.

We are also troubled by the nature of the proofs supporting the claim that inmate fear of the Klan will disrupt the delicate peace of the correctional facilities. No evidence pertinent to the plaintiff's facility is offered.

We agree with defendants' contention that the standard set down in *Tinker v Des Moines School Dist.* (393 US 503) applies here. The one who would abridge constitutional freedoms must demonstrate the disruption that the exercise of that freedom has caused to others in the institution. Defendants simply have failed to meet that burden. In the area of constitutionally protected action, we cannot rule on the basis of unfounded speculation.

To conclude, we reiterate our sympathy with the State's interest in a safe and efficient administration of its prison facilities. However, the method chosen treads too broadly on constitutional rights and cannot stand. Further, the defendants' offerings are inadequate proof that the dangers they fear truly exist. Finally, we are fearful that the challenged directive will not achieve the result the defendants hope for. Rather, tranquility and elimination of discrimination in the prisons will come only through a thorough examination of the practices of all corrections officers and by ferreting out those who violate departmental policy within the facilities.

This appeal also raises for review defendants' contention that they can lawfully inquire into plaintiff's associations. We hardly think this contention need be answered in light of our voiding of the directive, but we do note that even in the asking the State bears a heavy burden to show that the inquiry is necessary to protect a legitimate State interest *(Baird v State Bar of Arizona,* 401 US 1, 6-7). Where, as here, the State has failed to establish the danger of plaintiff's alleged associations, it cannot meet that burden.

The order and judgment should be affirmed, with costs.

KANE, J. (dissenting). The narrow issue to be resolved on this appeal is whether the questioned directive infringes upon a correction employee's freedom of association as protected by the First Amendment. We are not confronted with issues involving freedom of speech, religion, or assembly, and the authorities dealing with those subjects may not be directly in point when applied to the rather unique situation we must address in this case.

The policy statement accompanying the department's directive recited that as a result of an extensive investigation of alleged Klan activity within the State's correction system, it was revealed there were incidents of direct involvement in the Klan by its employees. Although these incidents were de-

scribed as being limited in number, "reports of potential activity and expressions of fear among employees and inmates are widespread and pervasive." The statement then went on to note that the department recognized the employees' right to freely associate as guaranteed by the First Amendment, as well as the inmates' right to humane treatment under the Eighth Amendment, and concluded that in the particular environment resulting from penal confinement, the presence of the Klan, or even the possibility of Klan related activity in that environment, could cripple the effective operation of a correctional facility. Thus, in promulgating the directive, the commissioner was obviously reacting to what he considered to be a real threat to the daily operation and security of the department's facilities and the safety of its employees and prisoners.

No one would question or seek to dilute the fundamental freedoms protected by the First Amendment or to retreat from the long line of cases defining and supporting those rights. However, it has never been suggested that the right of association is unqualified and, as the majority recognizes, judicial authorities have acknowledged the validity of certain restrictions on that right when a paramount and overriding governmental interest was sought to be advanced and when a less drastic means to achieve that purpose was unavailable (see *Elrod v Burns,* 427 US 347, 362; *Shelton v Tucker,* 364 US 488). Indeed, a regulation inhibiting an inmate's associational rights was recently upheld when it was concluded that the limitation was reasonable and consistent with the legitimate operational considerations of the involved prison *(Jones v North Carolina Prisoners' Labor Union,* 433 US 119).

The factual picture developed in this case demonstrates circumstances far different from those presented in earlier First Amendment association cases concerning political appointees in a sheriff's office, employees in defense plants, and teachers *(Elrod v Burns, supra; United States v Robel,* 389 US 258; *Keyishian v Board of Regents,* 385 US 589). In the matter at hand we are dealing with a peculiar type of environment entirely foreign to normal living conditions; one where we have no personal experience and little information other than that which may be gleaned from the statements of third parties. Restraint of liberty is the order of the day in prison, and if the authority personifying that restraint is, or is

thought to be, the representative of a secret organization with a history of promoting racial fear and hatred, then a difficult administrative task might well become impossible. In this connection the Supreme Court has aptly observed that: "[T]he interest in preserving order and authority in the prisons is self-evident. Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration. *Wolff v. McDonnell,* 418 U.S., at 561-562. Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot." *(Jones v North Carolina Prisoners' Labor Union, supra,* pp 132, 133.) I do not mean to imply that employment within the correction system entails the surrender of any constitutional rights, or that the status of such employees may be equated with inmates whose confinement automatically works a deprivation of particular associational rights. The key is that penal institutions, by their very nature, embrace staff and prisoner alike in a highly volatile setting which does not generally prevail in the rest of society. Anything that would exacerbate an already delicate condition should be avoided so long as the action taken does not offend constitutional principles. Under these somewhat unnatural circumstances, the directive in question is not a bar to employment in violation of First Amendment rights, but constitutes instead a valid restriction thereon to advance a compelling State interest in the orderly and safe administration of its correction facilities where no lesser action would suffice.

In focusing the rationale of *Robel (supra),* on the breadth of the challenged directive, the majority is drawn from a proper appreciation of the underlying issue in this case. The employment of Communist Party members at defense plants creates a variable security risk. The seriousness of the threat depends, at least in part, on the sensitivity of a given worker's post and the nature of his individual commitment to the goals of that organization. Here, by way of contrast, simple Klan membership poses a threat to the tranquility of an entire prison system which is constant and derives its existence wholly apart from any particular employee's occupational rank or his willingness to translate Klan beliefs into the detrimental performance of assigned duties. Attaching the label of Klans-

man to *any* employee, even if the appellation is untrue, will jeopardize that tranquility. Thus, it is precisely the fact of membership in the Ku Klux Klan, or suspected affiliation with it, that produces a result too dangerous to be accepted. Perhaps there will always be some correction officials who adhere to Klan tenets and who, like Communist defense workers, represent a potential threat to their respective employers, but that is not the point. Such employees can and should be dealt with on an individual basis without resort to an indiscriminate ban which presumes the realization of that potential from the mere fact of association with the group. In this case, however, it is the very thought of Klan involvement among employees that generates a hazard and, seen in that light, it is submitted that the majority has correctly selected the *Robel* standard, but applied it to the wrong problem. The directive makes sense as the only satisfactorily targeted response that could be put forth to advance the crucial need of preserving confidence and stability in the staff/inmate relationship. What the Klan is or has done lately matters little to those within the highly charged atmosphere of a correction facility; how it is regarded by those who must function in that environment is all important. Although taken from another context, I do not think it is too far-fetched to relate perceived Klan membership in this setting to the cry of fire in a crowded theatre.

Lastly, assuming the directive is invalid, I fail to understand the logic of the majority's further conclusion that an employee's Klan involvement may not be questioned, particularly since it seems to urge a thorough examination as the proper device to weed out any discriminatory violation of appellants' policies. Given the strong interest in the security and safety of its facilities and the direct connection between Klan influence and that interest, appellant should, at the very least, be permitted to inquire into the fact of Klan membership or attitudes among its employees. The danger of the association, if not sufficient to warrant an outright ban, is certainly too great to be ignored.

The subject directive should be declared constitutional.

SWEENEY, MAHONEY and MAIN, JJ., concur with GREENBLOTT, J. P.; KANE, J., dissents and votes to reverse in an opinion.

Order and judgment affirmed, with costs.