Robert C. McMULLEN, Plaintiff,

v.

Dale CARSON, etc., et al., Defendants.

No. 82–572–Civ–J–12.

United States District Court, M.D. Florida, Jacksonville Division.

July 14, 1983.

Samuel S. Jacobson, Warren K. Anderson, Jr., Jacksonville, Fla., for plaintiff.

Robert G. Alexander, and Michael B. Wedner, Jacksonville, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MELTON, District Judge.

Plaintiff Robert C. McMullen, a former clerical employee at the Office of the Sheriff of Duval County, Florida, brought this action against Sheriff Dale Carson and the City of Jacksonville ("City") pursuant to 28 U.S.C. §§ 2201, 2202 (1976), and 42 U.S.C. § 1983 (1976).

Plaintiff sued Sheriff Carson and the City alleging he was improperly dismissed from employment by Sheriff Carson in violation of his first amendment rights of freedom of speech, belief, association and assembly, as guaranteed against state infringement by the fourteenth amendment's due process clause. Plaintiff seeks reinstatement as an employee of the Sheriff's Office and also an award of back pay as damages from Sheriff Carson and the City. The parties have stipulated, however, that no damages will be sought from Sheriff Carson individually, but rather that the City alone will be responsible for damages in the event the Court concludes that plaintiff is so entitled. Plaintiff also seeks an injunction enjoining Sheriff Carson both individually and in his capacity as Sheriff against taking further actions in violation of plaintiff's constitutional rights.

After conducting a trial on the merits of this cause, and having heard argument by counsel for the respective parties, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Following initial applications and interviews, plaintiff was hired by the Jacksonville Sheriff's Office in August 1981 as a clerk typist. Plaintiff was discharged from that position on October 10, 1981, after having failed the typing portion of the requisite civil service examination. On October 12, 1981, plaintiff was hired as a temporary full time clerk in the records section of the Sheriff's Office. That position was a terminable-at-will position.

2. As a temporary full time clerk, plaintiff was responsible for filing both public and confidential records. Those records included automobile accident reports, criminal history files, and offense reports for ongoing criminal investigations. Plaintiff had unrestricted access to numerous state and national criminal records through the office's computer system. Plaintiff also performed fingerprinting services for various individuals seeking employment and registered firearms as part of his job.

3. Plaintiff performed his job in the records section very well. He was largely unsupervised during the working day. He received numerous compliments and at least one very favorable performance review from his superiors. Plaintiff was a courteous, conscientious employee who encountered no difficulties in getting along with his fellow employees or the public while a member of the records section.

4. In September 1981, plaintiff and his wife attended a Ku Klux Klan ("KKK" or "Klan") rally in Lakeland, Florida. He went to the rally to hear the remarks of Bill Wilkinson, the Imperial Wizard of the Invisible Empire of the Knights of the KKK. Plaintiff went to the rally with the purpose of joining the KKK. The rally was a "traditional" Klan rally which featured, among other things, a speech by Mr. Wilkinson and a "traditional cross lighting" ceremony. While there, plaintiff obtained an application form to join the Invisible Empire of the Knights of the KKK. He also met and spoke with Mr. Wilkinson. Plaintiff previously had seen Klan literature while living in North Carolina and agreed with the views of the Klan that black and white people should not mix. About a month after the rally, plaintiff completed and mailed in the application. In it, plaintiff's first allegiance was an "unqualified allegiance" to the white race throughout the world. Allegiance to his native country was subordinate.

5. In December 1981, plaintiff became a recruiter for the Klan. In January 1982, while still employed as a temporary full time clerk in the Sheriff's Office, plaintiff began his recruiting activities for the Invisible Empire of the Knights of the KKK. Recruiting on his own time, plaintiff distributed Klan literature and contact cards at shopping centers, flea markets, and other public areas.

6. In late January or early February 1982, the home of a black woman named Angela Harrell was burglarized in Jacksonville. Among other things, the burglars left a cross in the yard of the Harrell home. The incident received widespread publicity, which attributed the crime to the Klan. The investigation of the incident by the Sheriff's Office ultimately led to the conviction of a Marine and two juveniles, none of whom were members of the Klan. When first reported, however, the incident prompted Wilkinson to call plaintiff to inquire about the possibility of holding a press conference to disclaim Klan responsibility.

7. On February 13, 1982, Mr. Wilkinson and plaintiff held a press conference in front of City Hall. Andy Greenspan, a reporter for WJXT Channel 4, the local CBS affiliate, conducted a taped interview with plaintiff and Mr. Wilkinson. During that interview, Mr. Wilkinson disclaimed Klan responsibility for the Harrell incident. In addition, in response to a question, plaintiff identified himself as a recruiter for the KKK and as an employee of the Sheriff's Office. The Greenspan interview was broadcast over the 6:00 P.M. evening news on February 13, 1982. According to the station's ratings, anywhere from 117,000 to 182,000 adult viewers in the Jacksonville area watched the broadcast in which the interview was aired.

8. Media coverage regarding plaintiff's status as a recruiter for the KKK expanded rapidly. On February 14, 1982, both television and newspaper media published stories concerning plaintiff's status and activities.

9. Upon learning about plaintiff's recruitment activities, Sheriff Carson determined it was "vital" that plaintiff be dismissed immediately as an employee of the Sheriff's Office. He felt any delay in discharging plaintiff would seriously damage his and his employees' credibility in the Jacksonville community, including in particular the minority community, and would severely and adversely impact on his ability to enforce the law. The Sheriff was also concerned with maintaining high internal morale within his office, with avoiding possible violent demonstrations protesting the presence of the Klan within his office, and with maintaining as large a pool of qualified minority applicants for employment as

possible within the City's affirmative action plan.

10. On Monday, February 15, 1982, after a weekend of publicity concerning plaintiff's recruitment activities for the Klan and his being an employee of the Sheriff's Office, Sheriff Carson met with plaintiff and indicated he had no choice but to dismiss plaintiff. Plaintiff told the Sheriff he had expected the dismissal might occur.

11. Later during the day of February 15, 1982, Sheriff Carson appeared at a news conference to announce his action in terminating plaintiff. Sheriff Carson announced it was against the best interests of the department to retain plaintiff. Further, Sheriff Carson stated he felt he could not retain any member affiliated with an organization which promotes disruption of the peaceful existence of the community. The decision to discharge plaintiff was based solely on plaintiff's affiliation and activities with the KKK.

12. Plaintiff made remarks in TV interviews and was quoted in the press to the effect that his discharge would not prevent his Klan activities and that he would remain a Klan member for life.

13. The widely reported news that an employee of the Sheriff's Office was recruiting for the Klan generated an immediate and strong negative reaction in the black community in Jacksonville. Ronnie Ferguson, then Deputy Director (and now interim Executive Director) of the Jacksonville Urban League, a respected community organization concerned with minority affairs, testified that he and his colleagues received approximately 200 telephone calls and live comments from members of the black community expressing serious concern about the developing situation and inquiring what could be done about it. Numerous comments were made to the effect that arrests by Sheriff's personnel would be resisted at all costs for fear that the arrestees would never make it to the Duval County jail alive.

14. Subsequent to plaintiff's discharge on February 15, 1982, employees in the records section of the Sheriff's Office expressed relief that Sheriff Carson had acted swiftly to discharge plaintiff. Captain Nelson, a veteran of twenty-three years in the Sheriff's Office and a supervisor in the records section, testified, and the Court so finds, that if Sheriff Carson had not discharged plaintiff, given the significant minority representation within the records section as well as the conservative philosophies of the white employees in the section, disruptive confrontations with plaintiff would have been inevitable due to the employees' perceptions about the Klan.

15. The news media continued to cover plaintiff's situation on an almost daily basis. The local Jacksonville newspapers carried articles announcing that Mr. Wilkinson would lead a protest rally against Sheriff Carson's decision to discharge plaintiff on Thursday, February 25, 1982, outside the Duval County Courthouse.

16. At about 3:00 P.M. on Thursday, February 25, 1982, six hooded and robed Klansmen (five men and a woman) marched toward the Duval County Courthouse. Mr. Wilkinson, plaintiff and his wife, and three others marched in their outfits to the front of the courthouse. Plainclothes intelligence officers, uniformed patrolmen, and other security officers policed the rally. Notwithstanding the admonitions of the NAACP and other local religious leaders that people stay away from the rally, a crowd of between 200 and 300 people attended. Among those in attendance was a group of particularly agitated blacks.

17. Upon reaching the front of the courthouse, Mr. Wilkinson attempted to address the crowd but could not be heard as those in attendance shouted robust expressions of sentiments. After several minutes of back and forth shouting, the Klansmen began making their way toward the rear of the courthouse; the crowd and the news media continued to press around them. Judge Clifford B. Shepard, Chief Judge of the Fourth Judicial Circuit, came to the entrance where the rally group was eventually clustered. Judge Shepard directed that everyone leave the courthouse, as the noise was greatly disrupting the public's business.

The group then departed the courthouse. The Klansmen and the vocal crowd were eventually separated, and Sheriff's Office personnel escorted the Klansmen to safety.

18. Other Sheriff's Office personnel informed the crowd that all the Klansmen had left the area. The skeptical crowd declined to leave. Instead, they turned their attention to a couple of people parading around with a large confederate flag. Uniformed officers interceded to prevent an outbreak of violence. The police also arrested one person during the rally for throwing a rock into the crowd.

19. The local news media devoted considerable attention to the events of February 25, 1982. All three major TV stations aired reports of the event at 6:00 and 11:00 P.M. Some of those reports included film clips of violent confrontations in other cities in which the Klan was involved, as well as considerable background material about the philosophies, beliefs, and practices of Mr. Wilkinson and the KKK. According to the station's ratings figures, those news broadcasts were viewed by well over 200,000 adults in the Jacksonville area. In addition, the local Jacksonville newspapers provided extensive and widely read newspaper coverage.

20. The considerable media attention generated by the discovery of plaintiff's Klan affiliation helped plaintiff become publicly known, which is one of the requirements of being a recruiter and organizer of the Klan.

21. In about December 1982 or early January 1983, plaintiff decided to disassociate himself from the KKK. He had learned that Mr. Wilkinson wanted to exploit the considerable racial tensions in Miami to recruit new members for the Klan. Plaintiff, being personally opposed to "confrontational tactics," decided he no longer wished to recruit for the KKK and he so informed Mr. Wilkinson by mailing a letter of resignation. Plaintiff testified that had he known of Mr. Wilkinson's use of confrontational tactics before becoming a recruiter, he probably would not have joined the KKK. Plaintiff, however, did not disavow his belief that the white and the black races should be segregated. It appears from the record that no public mention of plaintiff's disassociation was made until plaintiff gave his deposition in this action on May 31, 1983, and he testified further as to that disassociation during the trial of this cause. Plaintiff realizes he and his family will continue to be associated with the Klan in the public's mind by virtue of his activities and beliefs, notwithstanding his disassociation, and he has no regrets of that fact. In fact, plaintiff would join a Klan group again if he could find one that shares his tactical preferences.

22. Plaintiff indicated he would be unable to return as an employee of the Sheriff's Office were the Court to conclude he is so entitled, as he and his wife have moved out of Jacksonville and returned to Madison County, Florida, for family reasons. The record does not reflect when, or even whether, plaintiff definitely intends to return to Jacksonville.

23. The vast majority of the public at large, including in particular the citizens served by the Jacksonville Sheriff's Office, views the various KKK organizations that exist throughout the country as a single, monolithic organization and perceives the Klan as an organization that espouses and widely engages in crime, violence, and racism. Further, the evidence shows that the Klan promotes white supremacy, religious and racial bigotry, and intimidation and violence against blacks and other minorities and ethnic groups as means toward its ends; the Klan specifically exacerbates racial tensions between blacks and whites for the purpose of increasing its recruitment activities. Moreover, the evidence shows that the Klan has engaged and continues to engage in such practices and divisive recruitment tactics, both in Florida and across the country. Plaintiff testified that precisely such tactics led to his disassociation from the KKK. Significantly, plaintiff testified he has been unable to locate any non-confrontational Klan chapter to join since his disassociation from the KKK. That testimony supports the substantial expert testimony in

the record concerning the practices of the KKK and, more generally, the Klan in America.

24. The Court heard extensive expert testimony from Irwin J. Suall, the director of the fact-finding department for the Anti-Defamation League of B'nai B'rith. Mr. Suall testified, and the Court so finds, that a "potentially disastrous problem" for law enforcement agencies exists in the form of Klan infiltration of police departments. Such infiltration impedes the ability of the police departments to do their work effectively and creates internal staff problems. Expressions such as "blue by day and white by night" and "the cops and the Klan go hand in hand" are indicative of the public's sentiments that the Klan has infiltrated public law enforcement agencies. Significantly, at the February 25, 1982, rally in Jacksonville, at least two of the people in attendance carried around signs with the latter slogan.

25. The Court heard expert testimony by Arthur Teitelbaum, the southern area director for the Anti-Defamation League of B'nai B'rith. Mr. Teitelbaum testified, and the Court so finds, that there would be a "very serious negative impact" on the mission of the Sheriff's Office in the community, manifested primarily by a heightened level of distrust among the citizens of the community, if a Klan presence were permitted in the Sheriff's Office regardless of the capacity in which the Klansman served. Mr. Teitelbaum further testified, and the Court so finds, that had Sheriff Carson not promptly discharged plaintiff, there would undoubtedly have been heightened distrust of the Sheriff's Office by the black community in Jacksonville, which probably would have increased the likelihood of violence in confrontations between black citizens and the police.

26. A very negative overall relationship existed between the black community and the Sheriff's Office immediately prior to the time plaintiff's Klan activities came to light. Sheriff Carson's efforts to recruit minority officers in compliance with the City's affirmative action goals, a process which is not easy to begin with, would have been virtually crippled had Sheriff Carson not promptly discharged plaintiff.

27. The immediate discharge of plaintiff was necessary in order to prevent a deleterious effect on both Sheriff Carson's ability to enforce the law in the community and the espirit de corps among the officers and employees of the Sheriff's Office.[1]

1. Many of the harmful effects resulting from a Klansman's presence in the Sheriff's Office were confirmed by plaintiff's testimony on cross-examination. An excerpt of his testimony follows:

Q: Wouldn't you agree, sir, that having somebody in the Klan ... [with] the Klan ... [having the] reputation ... [that] it has, [even] if it's not true, impacts on the office of the Sheriff?
A: Yes, sir. It probably would.
Q: Wouldn't you agree that that would make it more difficult for the Sheriff of Duval County to do his job in communities in delivering proper police services to the black community? For example, would make it more difficult?
A: Yes, sir.
Q: Wouldn't you agree that it would make tensions higher?
A: Yes, sir. It probably could.
Q: Since tensions are higher, the likelihood of the outbreak of violence is more likely?
A: Yes, sir. Probably so.
Q: Wouldn't you agree that the Sheriff of Duval County—I think you know. If you don't, just tell me—in 26 years would have a pretty good idea of whether that would happen?
A: Yes, sir. He probably would.
. . . .
Q: And in your judgment I believe you would admit, would you not, sir, that there is no question in your mind that Dale Carson did what he thought was right as a constitutional law enforcement officer of this county?
A: Yes, sir. I'm sure he did.
Q: Would you agree that the propensity or likelihood of violence goes up the minute the public perceives anybody on the police department being a member of the Klan?
A: Yes, sir. It probably would.
Q: Wouldn't you go so far as to say that it has a serious impact on the credibility of the Sheriff of this town to service all communities within the county, and specifically those of minority persuasion?
A: Yes, sir.
. . . .
Q: Do you think having a Klansman on the police department would impact adversely on the morale of the minority police officers?

*Conclusions of Law*

1. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 (1976).

■ 2. It is well established that terminable-at-will government employees, while they may generally be discharged for any number of reasons or for no reason at all, may not be discharged for exercising their constitutional rights. *E.g., Branti v. Finkel,* 445 U.S. 507, 514–16, 100 S.Ct. 1287, 1292–93, 63 L.Ed.2d 574 (1980).

3. The gravamen of plaintiff's complaint is that plaintiff's discharge by Sheriff Carson and the City violated plaintiff's first amendment rights of freedom of speech and of association, as guaranteed against state infringement by the fourteenth amendment's due process clause.[2]

4. The parties agree that the balancing test enunciated in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny, including most recently *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), provides much of the framework for the Court's first amendment analysis.

■ 5. Although highly cherished, neither freedom of speech nor freedom of association is absolute. To the contrary, sufficiently compelling legitimate governmental interests may justify limitations on those freedoms. *E.g., Connick v. Myers,* 103 S.Ct. at 1687; *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). "The *Pickering* balance requires full consideration of the government's interest" in efficiently performing its service to the public. *Connick v. Myers,* 103 S.Ct. at 1692. The governmental means chosen, however, must be the least restrictive of freedom of belief and association in achieving that governmental end. *Elrod v. Burns,* 427 U.S. at 362–66, 96 S.Ct. at 2684–86 (plurality opinion).

■ 6. As a preliminary matter, the Court notes that the effective rendering of police services is a function traditionally accorded special respect. *Leonard v. City of Columbus,* 705 F.2d 1299, 1304 (11th Cir. 1983). The United States Supreme Court has stated that "the promotion of safety of persons and property is unquestionably at the core of the State's police power ...." *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 1445–46, 47 L.Ed.2d 708 (1976). Moreover, courts have recognized that more deference to police should be accorded in the *Pickering* balance because safety of persons and property is invariably at issue. *Wilson v. Taylor,* 658 F.2d 1021, 1027 (5th Cir.1981) (Unit B), *cited with approval in*

A:  Yes, sir. It probably could.
Q:  It would hurt their morale; would it not?
A:  Yes, sir. It possibly could.
Q:  Isn't it true that—when I say "minority," just whatever that means to you. I take it you mean blacks and Jews, things like that. It would impact adversely on their view of whether or not the administration was or was not racist?
A:  Yes, sir. It could.
Q:  That's not good, is it?
A:  No, sir.
Q:  Bad, as a matter of fact?
A:  Yes, sir. It probably could affect the officers.
Q:  Your background is in law enforcement, generally speaking, corrections and military. And, you know, I think you like the order and form of it, the discipline of it. You don't want to be a part of an organization that is not disciplined, do you?
A:  No, sir. I like things in order.

Q:  You want good morale, don't you?
A:  Yes, sir.
Q:  When you have excellent credibility with the public, what does that mean? It means you can do a much better job, right?
A:  Yes, sir. I would say so.
Q:  In delivering those services to all citizens?
A:  Yes, sir.
Q:  So to have you down in the department as a Klansman, isn't it fair to say, sir, that delivery of police law enforcement services to the black communities of this town would be severely impacted?
A:  Yes, sir. They could be impacted.

2. Although plaintiff alleges in his complaint a violation of his right to peaceably assemble to petition the government for a redress of grievances, plaintiff did not pursue such claim at trial. Moreover, there is no evidence in the record to indicate any such violation.

*Leonard v. City of Columbus,* 705 F.2d at 1304.

7. In analyzing the competing interests at issue in this case, it has been clearly demonstrated by the defendants through overwhelming evidence in the record that the balance preponderates in favor of defendants. Plaintiff's discharge was justified by compelling, vital governmental interests, which would have been jeopardized if plaintiff remained employed in the Sheriff's Office.

8. It has been recognized that police departments have a legitimate governmental interest in maintaining an efficient and disciplined police force. *Stradley v. Andersen,* 478 F.2d 188, 190 (8th Cir.1973) (essential for policemen to obey strict disciplinary procedures and rules). *See generally Connick v. Myers,* 103 S.Ct. at 1692; *Leonard v. City of Columbus,* 705 F.2d at 1305–06; *Shawgo v. Spradlin,* 701 F.2d 470, 482–83 (5th Cir. 1983). There is an abundance of evidence in the record, including plaintiff's own testimony, that if plaintiff had not been discharged, internal discipline and morale within the Sheriff's Office would have suffered drastically. It is beyond peradventure that the maintenance of internal discipline and strong morale in a law enforcement agency is essential for the efficient operation of that agency.

9. It has been further recognized that police departments have an important governmental interest in maintaining public confidence in the police force and public respect for its officers. *E.g., Leonard v. City of Columbus,* 705 F.2d at 1305. The unrebutted evidence before the Court establishes that had Sheriff Carson not acted promptly in discharging plaintiff, the credibility of the Sheriff's Office within the Jacksonville community at large, and particularly within the Jacksonville minority community, would have been devastatingly and catastrophically impaired because the Klan is widely perceived as an organization dedicated to racism, criminality, and violence. Relations between the Sheriff's Office and the Jacksonville minority community, already fragile as of February 1982,

would have deteriorated even further had Sheriff Carson not discharged plaintiff. In addition, enforcing the law on the streets would have been more difficult, in light of the already existing lack of cooperation by black citizens with white police officers and the frequently expressed reaction in the black community that arrests would have been resisted more often if plaintiff remained an employee in the Sheriff's Office.

10. Finally, the damaged credibility of the Sheriff's Office within the Jacksonville minority community would have had the further negative consequence of impairing Sheriff Carson's ability to comply with the City's affirmative action ordinance in recruiting qualified minority officers and personnel. That affirmative action ordinance was adopted to implement numerous important federal constitutional and statutory policies. *See* Jacksonville, Fla., Code Ch. 150.103 (1979). Had plaintiff not been discharged, the number of qualified minority applicants for the Sheriff's Office would have decreased considerably, thereby frustrating the attainment of the goals embodied in the City's affirmative action ordinance.

11. The fact that the potential dangers outlined above had not yet impinged upon the effective and efficient operation of the Sheriff's Office is of little moment. The United States Supreme Court has stated that it is not necessary "for an employer to allow events to unfold to the extent that the destruction of working relationships is manifest before taking action." *Connick v. Myers,* 103 S.Ct. at 1692 (footnote omitted). Defendants' contention that the decision to discharge plaintiff was not based on merely undifferentiated fear is well supported in the record. The overwhelming weight of the evidence before the Court, including plaintiff's extensive concessions brought out on cross-examination, indicates that Sheriff Carson's peacekeeping and public service missions would have been severely impaired had he not acted with dispatch in discharging plaintiff. This probable impairment of Sheriff Carson's peacekeeping and public service missions was not mere

speculation but quite real as evidenced by the explosive confrontation between Klan demonstrators and the citizenry at the Klan rally held on February 25, 1982, after plaintiff's discharge.

12. This Court must also consider whether Sheriff Carson's action was the least restrictive means available to him. *Elrod v. Burns,* 427 U.S. at 362–63, 96 S.Ct. at 2684–85. The unrebutted testimony before the Court established that there were no other positions to which plaintiff could have been transferred within the Sheriff's Office without causing the previously mentioned deleterious effects on Sheriff Carson's law enforcement missions. The testimony before the Court indicated that the same internal disruptions and deterioration of credibility would have occurred no matter what job plaintiff held within the Sheriff's Office. Further, Sheriff Carson had no authority to hire plaintiff for any other City employment. Nor does the evidence reflect that plaintiff was interested in accepting any other City employment. Consequently, Sheriff Carson was faced with an all-or-nothing decision and plaintiff's discharge was the least restrictive means available to Sheriff Carson.

13. Plaintiff relies heavily on the Supreme Court's decisions in *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), and *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966), for the proposition that mere membership in an organization without specific advocacy of, or belief in, illegal conduct of the organization is constitutionally protected. Based on the record before the Court, plaintiff's argument is without merit. The evidence before this Court is that the Klan is, and is widely perceived as, an organization that deliberately engages in violence and terrorism to intimidate blacks and other minorities in order to further its membership goals. Plaintiff was not a mere passive member of the KKK; on the contrary, plaintiff was quite active in the organization and aggressively recruited new members. Plaintiff's recruiting conduct was inimical to Sheriff Carson's law enforcement missions.

14. Plaintiff's testimony that he may not have known exactly what he was getting involved with when he agreed to recruit for the KKK is not persuasive. First, Sheriff Carson need not catch plaintiff engaging in actual criminal conduct or allow events to unfold into disruption and destruction before acting. *Connick v. Myers,* 103 S.Ct. at 1692. Second, the Court is hesitant to accept at face value plaintiff's testimony that he had no knowledge of the KKK's confrontational and illegal activities when agreeing to be a recruiter. Plaintiff testified in his deposition prior to trial that he understood defendants' Exhibit 1, a flyer equating miscegenation with race treason punishable by death, as basically embodying the philosophy and precepts of the KKK, except for the advocacy of a second revolution. At trial, plaintiff attempted to disavow that testimony. In addition, plaintiff testified at trial that the oath of loyalty he swore to the Klan upon application for membership, giving unqualified allegiance first to the white race and thereafter to his country, was the same as his oath to the Sheriff's Office to uphold the laws of the United States. Such testimony suggests, in the Court's view, that plaintiff was not the innocent recruiter he purported to be.

15. For the foregoing reasons, the Court concludes that defendants Sheriff Carson and the City neither violated plaintiff's first amendment rights nor denied plaintiff due process of law. Defendants have proven sufficiently compelling governmental interests to justify plaintiff's discharge. *Cf. Curle v. Ward,* 59 A.D.2d 286, 399 N.Y.S.2d 308 (N.Y.App.Div.1977) (state must show compelling, vital interest to justify abridgement of prison guard's right to associate with KKK), *modified,* 46 N.Y.2d 1049, 389 N.E.2d 1070, 416 N.Y.S.2d 549 (N.Y.1979). The Court therefore need not and does not reach the questions of back-pay damages, reinstatement, and the propriety of issuing an injunction. The latter two questions, in any event, would be moot even if the Court were to have ruled in plaintiff's favor on the issue of liability, as plaintiff has left

Jacksonville for family reasons and has no immediate intention of returning.

Final judgment in accordance with these findings and conclusions will be entered in favor of defendants Sheriff Carson and the City.