OPINION OF THE COURT
Dominic R. Massaro, J.
The question before the court is whether the police, as claimed by defendant, abridged his right peaceably to assemble.
The facts of the case are undisputed. On December 29, 1991, at approximately 6:36 a.m., Police Officers John Hydek and Michael Depietri received a radio transmission that stated shots were fired at the location of Rosedale and Randall Avenues. After hearing a second transmission that there were a group of males in front of 1710 Randall Avenue, the officers responded, approaching the group from the rear of the location. As other police officers arrived on the scene, Mr. Rodriguez was observed fleeing from the assembly. Police Officers Hydek and Depietri gave chase, and Officer Depietri apprehended Mr. Rodriguez at Seward and Metcalf Avenues. He was subsequently indicted for criminal possession of a weapon in the third and fourth degrees (Penal Law § 265.02 [4]; § 265.01 [1]).
RIGHT OF ASSEMBLY
Speaking for the Court in the seminal Reconstruction era case, United States v Cruikshank (92 US 542 [1876]), Mr. Chief Justice Waite wrote (at 552): "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.”[1] The notion of a *1067 right of individuals to peaceably assemble is unique to the democratic system.[2]
The North Carolina Constitution (1776) was the first State constitution to declare: "That the people have a right to assemble together, to consult for their common good, to instruct their Representatives.”[3] The Constitutional Convention of 1787 did not include a Bill of Rights in the finished document; after it was ratified the movement for adding a Bill of Rights proposed, inter alia, "the right of the people peaceably to assemble.”[4] This right was incorporated into the First Amendment of the United States Constitution.[5]
The First Amendment provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.”[6]
In De Jonge v Oregon (299 US 353 [1937]), a unanimous Supreme Court ruled that the right to assemble is one of the basic rights of liberty; it is protected against invasion by the *1068 States under the Due Process Clause of the Fourteenth Amendment. Chief Justice Charles Evan Hughes, speaking for the Court (at 364), stated: "The First Amendment of the Federal Constitution expressly guarantees that right against abridgement by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions, principles which the Fourteenth Amendment embodies in the general terms of its due process clause”.
RIGHT NOT ABSOLUTE
Although it is well settled that the right of assembly is fundamental in our constitutional scheme of government, it is as well settled that this right, like other First Amendment rights, is not absolute under our laws (see, Adderley v Florida, 385 US 39 [1966]; Cox v Louisiana, 379 US 536 [1965]; People v Radich, 26 NY2d 114 [1970]; People v Street, 20 NY2d 231 [1967]; People v Dupont, 107 AD2d 247 [1st Dept 1985]). Neither the right of free speech nor public assembly means that anyone may express him or herself without limitation at any time or at any place, and even in certain public places (see, Cox v Louisiana, supra; Adderley v Florida, supra; Edwards v South Carolina, 372 US 229 [1963]; Poulos v New Hampshire, 345 US 395 [1953]).
Courts have long addressed the classic issue of balancing the right to regulate the use of city streets and other facilities to assure the safety and convenience of the citizenry in their use and the concomitant right(s) of free speech and of peaceable assembly (see, Cox v Louisiana, supra; see also, Kunz v New York, 340 US 290 [1951]; Cantwell v Connecticut, 310 US 296 [1940]; Thornhill v Alabama, 310 US 88 [1940]; Schneider v State, 308 US 147 [1939]; Hague v C.I.O., 307 US 496 [1939]; Lovell v Griffin, 303 US 444 [1938]).
It is clear that an abridgement of the exercise of a fundamental right is justified by the existence and demonstration of a compelling State interest (see, Curle v Ward, 59 AD2d 286 [3d Dept 1977]; Phelan v City of Buffalo, 54 AD2d 262 [4th Dept 1976]) provided that the least obtrusive means are used (see, City of New York v New St. Mark’s Baths, 130 Misc 2d 911 [Sup Ct, NY County 1986]). The facts of this case demonstrate the existence of a compelling State interest, namely, the protection of citizens in the threat of grave and immediate *1069 risks of harm. This interest is manifested by the two radio transmissions reporting shots being fired. The investigative action thereafter taken by the police would justify, beyond doubt, the interference with an individual’s First Amendment right to assemble. However, the court finds that Mr. Rodriguez’s voluntary act, specifically, his flight from the group, leaves the claimed abridgement bereft of support and without merit.
The facts of the case at hand do not suggest that Police Officers Hydek and Depietri in any manner interfered with defendant’s freedom of assembly. The officers were merely approaching those assembled in an effort to investigate a firing of shots that had occurred in the vicinity of the group. It is beyond cavil that police intrusion in an effort to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality (see, People v De Bour, 40 NY2d 210 [1976]). Such lawful inquiry does not interfere with the underlying right where its purpose is the public good and safety. Also, defendant, by his own initiative, abandoned the assembled group. The responsibility for this departure rests solely within the confines of defendant’s voluntary exodus.
EXPRESSIVE ASSOCIATION
Nor does Mr. Rodriguez’s presence in the street gathering otherwise warrant constitutional protection.
In the 1830’s, Alex de Tocqueville, writing about American democracy, stated: "The most natural privilege of man, next to the right of acting for himself, is that of combining his exertions with those of his fellow creatures and of acting in common with them. The right of association therefore appears to me almost as inalienable in its nature as the right of personal liberty. No legislator can attack it without impairing the foundation of society.”[7]
While the right of association is not explicitly mentioned in the text of the Constitution, the Supreme Court has recognized both the protection of this freedom and the privacy of one’s choice of associates, noting that such choice(s) is likewise an implicit First Amendment right (see, N.A.A.C.P. v Alabama, 357 US 449 [1958]; Shelton v Tucker, 364 US 479 [1960]; Curle v Ward, supra). The right to engage in association for *1070 the advancement of beliefs and ideas or the airing of grievances is an inseparable aspect of freedom. In Roberts v United States Jaycees (468 US 609 [1984]), the Supreme Court noted different categories of freedom of association that are protected by the Constitution: "Our decisions have referred to constitutionally protected 'freedom of association’ in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion” (at 617-618).
In the realm of "intimate association,” the relationships that have been afforded constitutional protection have taken many forms involving the creation and sustenance of a family (Roberts v United States Jaycees, supra, at 619). They include marriage (see, Zablocki v Redhail, 434 US 374 [1978]); the begetting and bearing of children (see, Carey v Population Servs. Intl., 431 US 678 [1977]); cohabitation with relatives (see, Moore v East Cleveland, 431 US 494 [1977]); and child rearing and education (see, Pierce v Society of Sisters, 268 US 510 [1925]).
Central to any analysis of "expressive association” are the objective characteristics of the associational conduct. The factors that are relevant include size, purpose, policies, selectivity, congeniality and other characteristics that in a particular case may be pertinent (see, Roberts v United States Jaycees, supra).
The evidence in this case clearly indicates that the activity Mr. Rodriguez was engaged in does not satisfy the kind of "intimate” or "expressive” association that warrants constitutional protection. The "association” that defendant was involved in had no definite objective, specified policies, designated purpose or membership selection process. In fact, it was not organized or united for any common intention. The factors uniting defendant with the other individuals in front of 1710 Randall Avenue leave no indicia of expressive activi *1071 ties beyond, if at all, a mere gathering for the vague purpose of social gratification.
In Dallas v Stanglin (490 US 19 [1989]), the Supreme Court did not find an ordinance restricting minors from a dance hall as a violation of their First Amendment associational rights. It held that the opportunities of adults and minors to dance with one another, which might be " 'associational’ in common parlance * * * do not involve the sort of expressive association that the First Amendment has been held to protect” (at 24). The Court further stated, "It is possible to find some kernel of expression in almost every activity a person undertakes — for example * * * meeting one’s friends at a shopping mall — but such a kernel is not sufficient to bring the activity within the protection of the First Amendment” (supra, at 25).
CONCLUSION
State police power has been upheld over claims of First Amendment rights of association where the nature of the assemblage is not for the advancement of beliefs and ideas or the airing of grievances, but predominantly either for entertainment or personal gratification (see, City of New York v New St. Mark’s Baths, supra [involving an injunction closing a bathhouse on public nuisance grounds pursuant to State regulations aimed at preventing the spread of AIDS]; see also, Cornelius v Benevolent Protective Order of Elks, 382 F Supp 1182, 1195-1196 [D Conn 1974] ["The associational activities of the Elks and Moose are purely social and not political and therefore do not come within the core protection of the right to associate”]). Similarly, the type of gathering the defendant was involved in was purely social. Such a gathering is not protected under the First Amendment of the United States Constitution.

. During the formative period of our jurisprudential history, the Boston Massacre trial initiated the question of lawful versus unlawful assembly on American soil. (Rex v Preson [1770]; see, 3 Butterfield, Legal Papers of John Adams, at 46-98 [1965].) On October 24, 1770, John Adams, appearing for the defense, noted: "By the English common law, a party of soldiers sent by *1067 their commanding officer is a body lawfully assembled * * * [I]f any of them does an illegal action, he alone is accountable. Whereas they who are illegally assembled, together they are accountable for each one’s separate action.” (Bowen, John Adams and the American Revolution, at 379 [1950].)
The First Continental Congress, on October 14, 1774, adopted a "Declaration of Resolves” which, among other things, asserted that the colonists " 'have a right peaceably to assemble.’ ” (Fellman, Constitutional Right of Association, at 5 [1963].)

. During the Roman era, the affirmative right of assembly, as we know it today, did not exist. (See generally, Crook, Law and Life of Rome 90 B.C.— A.D. 212.)
Under English common law, the right to assemble was closely connected with the right of petition. (See, Pollard, The Evolution of Parliament, at 329 if [1920].) This right of petition is first mentioned as early as Magna Carta (ch 61 [1215]). The common-law right to peaceable assembly was further qualified with the advent of the first statute on unlawful assemblies, passed under the rule of Henry IV. (See, 13 Henry IV, ch 7, § 1 [1412].) Just when the common-law rule with respect to unlawful assemblies became evident is difficult to ascertain, but it appears that riot and unlawful assembly as offenses were beginning to acquire their modern characteristics during the latter part of the sixteenth century. (See, 8 Holdsworth, History of English Law, at 324 [1926].)

. NC Const, Declaration of Rights, art 18 (1776).

. See, Dumbauld, The Bill of Rights and What it Means Today, at 210 (1957).

. US Const 1st Amend (1791); see also, NY Const, art I, § 9.

. Id.

. 1 de Tocqueville, Democracy in America, at 98 (Heffner ed 1956).