**Gary PISCOTTANO, et al., Plaintiffs,**

**v.**

**Brian MURPHY, Deputy Commissioner, Department of Correction, et al., Defendant.**

**No. 3:04CV682 (MRK).**

United States District Court, D. Connecticut.

May 14, 2004.

Kathleen Eldergill, Beck & Eldergill, Manchester, CT, for Plaintiffs.

Mark P. Kindall, Attorney General's Office, Hartford, CT, for Defendant.

### MEMORANDUM OF DECISION

KRAVITZ, District Judge.

This is an action under 42 U.S.C. § 1983 and § 1988 by five corrections officers employed by the State of Connecticut's Department of Correction ("DOC") who claim that the defendants—the Commissioner, the Deputy Commissioner and three Wardens of DOC—disciplined them in violation of their constitutional rights under the First Amendment and the Fourteenth Amendment for associating with a motorcycle group known as the Outlaws Motorcycle Club ("Outlaws"). The present proceedings arise from the Plaintiffs' Motion for Preliminary Injunction [doc. # 4]. The parties engaged in expedited discovery following the filing of this action and submitted briefs, including proposed findings of fact and conclusions of law. This Court held two full days of hearings on the motion, during which the Court heard testimony from each Plaintiff and from the Commissioner and Deputy Commissioner of DOC, among others. On May 3, 2004, the Court entertained two hours of oral argument on the motion. In view of the urgency of this matter and both parties' need for a prompt decision on the pending motion, the Court issued an oral ruling on May 4, 2004. This memorandum of decision does not change the result or the reasoning of the oral ruling but merely sets forth the Court's orally announced findings of fact and conclusions of law in the form of a written decision. As noted at the time this Court's oral ruling was announced, Plaintiffs' Motion for Preliminary Injunction [doc. # 4] is DENIED.

### I.

It is undisputed that in or about August 2003, DOC began an investigation into allegations, some of which were included in an anonymous email message that Commissioner Lantz received (Def's Ex. 504), that several correctional officers were members of, or had been associating with, the Outlaws. In connection with the investigation, DOC interviewed each of the plaintiffs in September 2003 about their involvement and association with the Outlaws. Plaintiff Piscottano has worked for DOC for approximately 18 years and was at the time

working as a correctional officer at Northern Correctional Center, a supermax facility, which is the highest security level for correctional facilities in the State. Plaintiff Sabettini, a 12 year veteran of DOC, also worked at Northern, where he oversaw lower-level inmates from Enfield who took care of the grounds at Northern. Plaintiff Vincenzo has worked for DOC for approximately 18½ years; he supervised inmates at a medium-security facility. Plaintiff Kight has worked for DOC for approximately 11½ years and at times relevant to this case was a correctional officer at the Webster facility, which is a minimal security facility. Plaintiff Scappini has worked for DOC for 9 years, and he also worked at Webster overseeing inmates at the time of the events in question. None of these officers had ever been subjected to any disciplinary action in the course of their employment with DOC.

On or about September 18, 2003, DOC's Director of Security issued a report (the "Report") on the investigation, Pls' Ex. 3. The Court will not repeat in detail the contents of the Report. Suffice it to say that it contains a summary of certain historical information regarding the Outlaws that had been gathered from a National Drug Intelligence Center ("NDIC") report dated October 2002. That summary indicated that the Outlaws Club was an expanding motorcycle club that was a rival to the Hell's Angels Motorcycle Club. The summary reported that the Outlaws group was considered a major drug producer and trafficker that had used extreme violence to protect and expand its territorial influence, that Outlaws members were known to associate with self-proclaimed militias and white supremacist groups, and that the Outlaws sold stolen motorcycle parts and laundered the illegal proceeds. The summary stated that RICO prosecutions had been instituted against Outlaws in Florida, Indiana, North Carolina, and Wisconsin and that a number of Outlaws members had been convicted of felonies. The NDIC concluded that the Outlaws "will become a greater threat to the general public and law enforcement" in the foreseeable future and noted that "law enforcement sources expect the newly founded New England chapters to follow suit with the criminal activity of older established chapters." *Id.*, at 6.

As it relates to Plaintiffs, the Report summarized interviews with each Plaintiff and the results of DOC investigatory efforts. The Report stated that Officers Piscottano, Sabettini, and Kight admitted being members of the Outlaws at one time but claimed to have left the group before DOC commenced its investigation. However, the Report concluded that Officers Piscottano, Sabettini, and Kight had been less than truthful about their association with the Outlaws during the investigation since DOC believed that they continued to be associated with and involved in the Outlaws despite their claim that they were no longer members. While Officers Vincenzo and Scappini—who were never members of the Outlaws but who did attend some Outlaws functions—were not found to have been less than truthful, the Report noted a concern that all of the correctional officials were associating with known felons and other members of a group, the Outlaws, that was known nationally as having been involved in criminal enterprises.

The Report recommended that each Plaintiff be found in violation of Administrative Directive 2.17 (Def's Ex. 502) in several respects. Among other things, Officers Piscottano, Sabettini, and Kight were cited for violating subsections that prohibit officers from failing to cooperate fully and truthfully in an inquiry or investigation conducted by DOC and from lying or giving false testimony during the course of a departmental investigation. All of the

Plaintiffs were also cited for engaging in conduct that constitutes or gives rise to the appearance of a conflict of interest, engaging in unprofessional or illegal behavior that could reflect negatively on the DOC, and for acting in ways that jeopardize the security of the unit, or the health, safety, or welfare of the public staff or inmates. *See* Pls' Ex. 3, at 15–18.

In November 2003, Commissioner Lantz decided to create five separate investigations for Plaintiffs, and at that time each Plaintiff was placed on paid administrative leave pending conclusion of the investigations. At or around the same time, Plaintiffs were given copies of the Report and, through their counsel, each Plaintiff submitted responses to it. In sum, those responses disputed that the Waterbury Chapter of the Outlaws—with which the five Plaintiffs had been associated and which had only begun operations in approximately January 2002—was involved in any criminal activity or violent conduct of the sort that the Report attributed to the national Outlaws. The responses disputed that Plaintiffs had been less than truthful during the investigation. Plaintiffs also submitted information that various DOC officials had led them to believe that their association with the Outlaws would not pose a problem so long as Plaintiffs were not involved in criminal activity. Each Plaintiff was also given one or more hearings under the principles set forth in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

The investigatory files on each Plaintiff (which have been marked in their entirety as Def's Exhibits 513–517) were reviewed by various officials of the DOC including human resources personnel, the Deputy Commissioner, and the Commissioner. Based upon recommendations of the Deputy Commissioner and the human resources personnel and upon review of the factual circumstances, the Commissioner made her decisions regarding each plaintiff. Both the Deputy Commissioner and Commissioner testified at length regarding the reasons for their decisions and recommendations regarding each Plaintiff. Each agreed that three of the Plaintiffs should be dismissed due to a combination of the fact that they had been less than truthful about their association with the Outlaws and the fact that the Outlaws group was considered a criminal enterprise and a gang with whom DOC officers should not associate because of security, safety, and conflict of interest concerns. As to the two Plaintiffs who had been truthful during the DOC investigation, they would receive formal counseling because of the security, safety, and conflict of interest issues raised by their association with what the Commissioner and Deputy Commissioner considered to be a gang or criminal enterprise.

On or about April 22, 2004, plaintiffs were notified by DOC of those actions. Plaintiffs Scappini and Vincenzo were issued what DOC termed a "Formal Counseling" for violating AD 2.17. Pl's Ex. 10, 18. The letter informed them that any recurrence of the behavior giving rise to the counseling would result in more severe disciplinary action up to and including dismissal. Plaintiffs Piscottano, Sabettini, and Kight were each told they would be dismissed from State service for just cause for violating AD 2.17. Pl's Ex. 2, 7, 13. Specifically, they were told that based upon the Security Division investigation they were found to have been less than truthful when questioned regarding their association with the Outlaws. Unless enjoined, the dismissal of each Plaintiff would take effect on May 6, 2004. Each Plaintiff is a member of a union and has already filed a grievance challenging the disciplinary action, or will do so shortly.

There are a number of factual issues that are in dispute, including whether certain Plaintiffs were entirely truthful about their association with the Outlaws during the DOC investigation, whether the Outlaws group in Connecticut—as opposed to the national or international Outlaws group—poses any threat or danger to the public or to the safety or well being of inmates or DOC personnel, whether the Formal Counseling Officers Vincenzo and Scappini received constitutes disciplinary action, and whether the punishment Officers Piscottano, Sabettini, and Kight received was more severe than is typically meted out for untruthfulness. As will become apparent, however, this Court need not resolve those factual disputes at this time and will accept Plaintiffs' version of the facts for purposes of the pending motion for a preliminary injunction motion.

## II.

Plaintiffs seek an order enjoining DOC during the pendency of this action from dismissing three of the Plaintiffs, rescinding the formal counseling given to two of the Plaintiffs, and ordering DOC not to take any action against any Plaintiff for associating with or becoming a member of the Outlaws. Application for Prelim. Inj., at 1–2.

Ordinarily, to obtain a preliminary injunction, a plaintiff must establish the following: (1) irreparable harm; and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348–49 (2d Cir.2003). In this case, however, both Plaintiffs and Defendants argue that the usual test does not apply.

### A. Irreparable Harm

The Second Circuit has said repeatedly that it considers "a showing of irreparable harm to be the most important prerequisite for the issuance of a preliminary injunction." *See, e.g., NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir.1995). Plaintiffs conceded at oral argument that under the Supreme Court's decision in *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), they could not show irreparable harm simply by virtue of the employment actions taken against them. As the Supreme Court said in *Sampson*, "Assuming for the purpose of discussion that respondent had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." *Id.* at 91–92, 94 S.Ct. 937.

■ However, Plaintiffs claim that they are entitled to a presumption of irreparable harm because this case involves First Amendment rights. Invoking the oft-quoted words of the Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Plaintiffs assert that any loss of First Amendment freedoms for even minimal periods of time "unquestionably constitutes irreparable injury." *Id.* at 373, 96 S.Ct. 2673. Despite this rather broad language in *Elrod*, however, courts have recognized that plaintiffs invoking the First Amendment do not always get a free pass on irreparable harm. As the Second Circuit has noted, "[w]e have not consistently presumed irreparable harm in cases involving allegations of abridgement of First Amendment rights." *Bronx Household of Faith*, 331 F.3d at 349. Unless a governmental directive limits protected

speech directly (and both sides concede that is not the case here), the Second Circuit has required that a First Amendment plaintiff seeking an injunction demonstrate that a challenged governmental action has had or likely will have an actual chilling effect on speech. *Id.; see also Latino Officers Ass'n v. Safir,* 170 F.3d 167, 171 (2d Cir.1999) (holding that a conjectural chill is not sufficient for demonstrating irreparable harm). Plaintiffs assert that being fired for associating with the Outlaws constitutes just such an actual and imminent chill on the exercise of their First Amendment rights and that as a consequence, they are entitled to the *Elrod* presumption of irreparable harm.

Strictly speaking, existing case law does not seem to place any minimum on the First Amendment interest a party must assert to qualify for the irreparable harm presumption. It is clear that at least for those Plaintiffs who will be dismissed, they can demonstrate that as a direct result of exercising what they believe is their First Amendment right to associate with the Outlaws, they will suffer adverse employment actions. And, as to the Plaintiffs who have received Formal Counseling, they have been told not to associate with the Outlaws or they will face further discipline. Therefore, it would appear that under existing precedent, Plaintiffs have made all the showing they must make in order to qualify for a presumption of irreparable harm. For purposes of this preliminary injunction motion the Court will assume that Plaintiffs have established irreparable harm.

However, the Court notes significant misgivings about Plaintiffs' position. As will be explained later, Plaintiffs have asserted a weak First Amendment claim, one that is very far from the concepts of speech or association that lie at the core of the First Amendment. Since most of the cases that have involved presumed irreparable harm have presented claims that implicate core First Amendment values where there is a genuine concern about prior restraints and chilling effects—*see, e.g., Elrod,* 427 U.S. at 350–51, 96 S.Ct. 2673; *Bronx Household of Faith,* 331 F.3d at 346–48; *Bery v. City of New York,* 97 F.3d 689, 691–92 (2d Cir.1996)—it is not clear to this Court that the presumption of irreparable harm should apply when a court is confronted with a claim of infringement on associational rights involving a social club (if one accepts Plaintiffs' view of the facts) or a gang (if one accepts Defendants'). It is difficult for this Court to accept that the inability to engage in what is, in the most benign construction of the facts, purely social contact with the Outlaws while this action is pending (e.g., riding a motorcycle, going to parties, engaging in fellowship with club members) so threatens First Amendment interests as to require this Court to presume irreparable harm.

When, as here, a plaintiff asserts a First Amendment claim that does not implicate core First Amendment values or rights—and is a weak claim at that—this Court has considerable concern about the wisdom of presuming irreparable harm, particularly in view of the Supreme Court's analysis of irreparable harm in the government employment context in *Sampson.* In this regard, the Court notes that each Plaintiff who had previously been a member of the Outlaws testified that they had discontinued their membership in the organization before the DOC had begun its investigation and for reasons entirely unrelated to the investigation and only one Plaintiff—Officer Kight—expressed any interest in renewing his membership in the Outlaws. The remaining Plaintiffs did testify that they wanted to attend the Outlaws' social events. But, even assuming that Plaintiffs have a First Amendment right to attend those social events, the Court doubts that

being prevented from attending social events during the pendency of this action is the type of injury that should give rise to a presumption of irreparable harm and that should, therefore, justify a preliminary injunction against state officials in the management of their employee workforce.

Nonetheless, in the absence of any case law explicitly embracing the Court's view of this issue and in the face of broad *Elrod*-type language in so many decisions of the Second Circuit and other courts, this Court will assume that Plaintiffs will suffer irreparable harm by virtue of the expected infringement on their alleged First Amendment rights. Parenthetically, however, the Court notes, and Plaintiffs acknowledge, that they must establish the existence of irreparable harm on their non-First Amendment claims—namely, their Fourteenth Amendment Equal Protection claim—and, for reasons set forth in *Sampson*, Plaintiffs cannot make such a showing. Therefore, Plaintiffs would not be entitled to a preliminary injunction on their Fourteenth Amendment claims even if they could demonstrate a likelihood of success on them.

### B. Likelihood of Success/Serious Questions on the Merits

Having cleared the irreparable harm hurdle, Plaintiffs move on to the merits stage of the preliminary injunction inquiry. DOC asserts that because this case involves a governmental action, Plaintiffs must establish that they have a likelihood of success on the merits rather than simply showing serious questions going to the merits that make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiffs' favor. The cases on which DOC relies hold that where "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the more demanding preliminary

injunction standard applies. *Bery,* 97 F.3d at 694. "This exception reflects the idea that governmental policies implemented through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995).

■ In the Court's view, the present case is distinguishable from the cases on which DOC relies. The actions at issue in this case were not reached through democratic processes; rather, they involve individual employment actions by DOC officials. DOC is thus not entitled to insist on the more stringent likelihood of success showing that applies in the context of legislative or other action that is the result of democratic processes. *See, e.g., Carey v. Klutznick,* 637 F.2d 834 (2d Cir.1980), *Hudson River Sloop Clearwater Inc. v. Dept. of the Navy,* 836 F.2d 760, 763 (2d Cir.1988), *Time Warner Cable v. Bloomberg L.P.,* 118 F.3d 917, 923 (2d Cir.1997); *see also Reynolds v. Giuliani,* 35 F.Supp.2d 331, 338–39 (S.D.N.Y.1999). Indeed, at argument, counsel for the DOC conceded that he knew of no case holding that the higher standard governs in a case such as this.

■ Therefore, the Court must consider whether Plaintiffs have demonstrated serious questions going to the merits of their claims and a balance of hardship tipping decidedly in their favor. The Court concludes that Plaintiffs have not established either prong of the standard for granting a preliminary injunction.

### C. Serious Questions Going to the Merits

**1. Plaintiffs' Expressive Association Claim.** When speech is the basis for an adverse employment action, or, in other words, if the state would not have taken a challenged action in the absence of pro-

tected speech (as the Court is assuming in this case for the purpose of this analysis), the balancing test set out in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), governs. *See, e.g., Heil v. Santoro,* 147 F.3d 103, 109 (2d Cir.1998). Even though the facts of *Pickering* itself involve a freedom of speech claim, the Second Circuit has made it clear that *Pickering* is also the relevant analysis for freedom of association claims. *Melzer v. Bd. of Educ.,* 336 F.3d 185, 194–95 (2d Cir.2003). The *Pickering* test establishes that "first, a court must determine whether the speech which led to an employee's discipline relates to a matter of public concern; and, second, if so, the balance between free speech concerns is weighed against efficient public service to ascertain to which the scale tips." *Id.* at 193. Whether the first step of the *Pickering* test—the so-called "public concern" analysis—applies to expressive associational claims was an open question until last month, when the Second Circuit resolved it in the affirmative. *Cobb v. Pozzi,* 363 F.3d 89 (2d Cir.2004). In *Cobb,* the Second Circuit announced that it had joined the Fourth, Sixth, and Seventh Circuits in holding that "a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern." *Id.,* 363 F.3d at 102.

In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court explained that "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. *Connick* also instructs that "when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, governmental officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. 1684.

Considering the record as a whole, the Court finds that this case does not involve a matter of public concern. The testimony was uniform that the purpose of Plaintiffs' association with the Outlaws is entirely social in nature and there was no evidence that Plaintiffs' association with the Outlaws involved any issue of public concern or involved any speech of any kind. Thus, Officer Piscottano testified as follows: "Q. And what's the point of going through this process before one can become a member? A. To ride a motorcycle, not to just have one but to ride it. Attend functions. Get to know people, become good friends, and learn to treat each other with respect and kind of like the extension of your family." Transcript of Hearing, at 5. Officer Sabettini similarly testified that he became a member "because I wanted to ride a motorcycle." *Id.* at 66. When asked why he attends Outlaws' parties, Officer Vincenzo testified, "Pay 15 bucks for all you can eat. Good deal. Cheap beers, cheap water. Good times. Good people." *Id.* at 75. Later, he said, "I've been a biker my whole life. I ride. I attend parties. That's what I do." *Id.* at 94. Officer Kight was asked what kinds of things he did as a member of the Outlaws, and testified that they "rode the bikes a lot, went to a lot of events, cookouts, parties, funerals, things like that." *Id.* at 102. Officer Scappini gave similar testimony about the fact that he associated with the Outlaws in order to attend parties and to have good times and good food with his friends.

All of the Plaintiffs testified that their purposes in wanting to associate with the Outlaws were purely social and not one of them testified to any speech-related conduct by them or the Outlaws or any in-

volvement by the Outlaws or any Plaintiff in any public issues or on any matters of public concern. In reciting this testimony, the Court does not intend in any way to demean or belittle the value of friendship and fellowship. Nevertheless, riding motorcycles, going to parties, and bonding with friends—important as those activities undoubtedly are to Plaintiffs—simply do not touch upon matters of public concern, as required by the case law.

In arguing that their association with the Outlaws does carry expressive content and speaks to matters of public concern, Plaintiffs emphasize the Outlaws' message of acceptance of non-mainstream individuals, of nonconformance to society's rules, and of the values of biking and brotherhood. In support, Plaintiffs point to Plaintiffs' Exhibit 6, which is a page from the National Outlaws' website explaining the meaning of the 1% logo that the Outlaws use.[1] But Officer Kight, the only Plaintiff to testify regarding this exhibit, said he did not know if Exhibit 6 was still on the Outlaws' web site, as he does not visit the website. Indeed, each Plaintiff sought to distance himself from the national Outlaws group during the testimony at the preliminary injunction hearing. While Officer Kight testified that the information set forth on the national Outlaws' website page also represented the philosophy of the Waterbury chapter of the Outlaws, that statement of philosophy still does not touch matters of public concern. Rather, it describes the kind of person who ordinarily become a member of the Outlaws— namely, someone who does not conform to society's rules. That is simply not enough to satisfy *Connick's* public concern test.

If Plaintiffs' argument were correct, any grouping of people for any purpose would involve a matter of public concern. Associating with a running club may carry an expressive message of health and athleticism, just as associating with the Outlaws may connote nonconformity and affinity for motorcycles. But associating with either group would not, in and of itself, implicate matters of public concern within the meaning of *Pickering* and *Connick.*

As the Seventh Circuit has noted, "Our precedent makes clear ... that speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in *Connick.* Rather, we must instead delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public. ... It is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Kokkinis v. Ivkovich,* 185 F.3d 840, 844 (7th Cir.1999) (internal quotations omitted). Following this analysis, which the Court finds persuasive, any claims made by Plaintiffs about the necessarily expressive nature of the organization, embodying the ideals of biking and brotherhood, cannot qualify as a "matter of political, social, or other concern to the community," since on the basis of the entire record on the pending motion, this Court finds that the purpose of Plaintiffs' association with the Outlaws was to further a purely private interest.

Plaintiffs also cite a number of cases, which they argue are analogous, and in which courts found *Pickering's* public con-

---

1. State Police Officer Williams testified that the Outlaws' 1% logo reflects the idea that the Outlaws and other motorcycle gangs represent the 1% of bikers who do not follow the laws, whereas the other 99% of bikers are law-abiding. Transcript at 183. The website explains the 1% logo in less inflammatory terms. Pls' Ex. 6.

cern requirement satisfied. This Court does not view those cases as authoritative in the context of this case. *Castorina v. Madison County Sch. Bd.*, 246 F.3d 536 (6th Cir.2001) involved students who were sent home from school for wearing t-shirts with the Confederate flag on them. However, in that case the students asserted, and the court found, that they wore the shirts specifically for the expressive message they promoted. That case thus differs from this case where there has been no testimony regarding any expressive message that any of the Plaintiffs sought to promote by wearing the insignias affixed to their jackets—their "colors"—other than to proclaim their membership in the Outlaws. Indeed, Officers Piscottano and Sabettini testified that they had turned in their colors when they terminated their membership in the Outlaws, long before the DOC investigation began. Officers Vincenzo and Scappini testified that they never wore the Outlaws colors because they were never members. Only Officer Kight testified that he occasionally wore his colors despite his assertion that he had relinquished his membership in the Outlaws. But Officer Kight never testified that he wore his colors in order to spread or promote a public message of any kind; instead, he did so simply to signify his association with the group. Given their testimony, therefore, Plaintiffs cannot found their First Amendment claim on any expressive message provided by the Outlaws' "colors."

Plaintiffs also urge this Court to follow *Berger v. Battaglia*, 779 F.2d 992 (4th Cir.1985), in which the Fourth Circuit found that a police officer who performed off duty in blackface was engaged in speech on a matter of public concern and thus qualified for the higher standard of scrutiny under *Pickering*. The court there set up a dichotomy between "whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." *Id.* at 999. The court then concluded that because plaintiff's speech dealt with racism, a "matter of obvious public interest," the speech involved public concern. Plaintiffs argue that this language, along with similar language in a concurring opinion by Justice O'Connor in *United States v. National Treasury Employees Union,* indicates that for *Pickering* purposes, the only "private" speech is that which is related to private employment concerns. 513 U.S. 454, 480, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (O'Connor, J., concurring) (pointing out that there is no question that the speech in question there was of public concern as the ban in that case applied to "off-hour speech bearing no nexus to Government employment— speech that by definition does not relate to 'internal office affairs' or the employee's status as an employee").

Even if Plaintiffs were correct in their reading of *Berger* and *Treasury Employees Union,* the cases would not help Plaintiffs because DOC's unwillingness to allow them to associate with an organization that DOC considered to be a gang does, in fact, qualify as a purely internal employment dispute. More fundamentally, however, it seems more likely that *Berger* and the language used by Justice O'Connor in *Treasury Employees Union* were limited to the facts of those cases, for it seems too plain for words that there could be other, non-employment related, matters which could only be considered as matters of purely private interest. This Court believes that the associational right asserted in this case falls under the heading of private concern. It certainly does not involve as pressing a public matter as racism, and does not involve First Amendment activity directed towards the general public, as the performances in *Berger*

were. Thus, assessing the "content, form, and context of a given statement, as revealed by the whole record," as required by *Connick*, this Court concludes that Plaintiffs' association with the Outlaws did not address, and was not intended to address, matters of public concern.

Of course, that does not mean that Plaintiffs' associational rights are without any First Amendment protection. *Connick* teaches that even speech that does not touch matters of public concern may nonetheless be entitled to some First Amendment protection. What it does mean, however, and Plaintiffs' counsel conceded this at argument, is that Plaintiffs are not entitled to the heightened scrutiny that *Pickering* provides.

■ As Plaintiffs' counsel acknowledged at argument, if speech is not on a matter of public concern, at best, only rational basis scrutiny applies. Indeed, the Supreme Court in *Connick* stated that if speech cannot fairly be characterized as constituting speech on matter of public concern, "it is unnecessary for us to scrutinize the reasons for [the] discharge." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. The reason is that "when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Id.* The Supreme Court went on to state the following: "We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147, 103 S.Ct. 1684.

Heeding these words from *Connick*, this Court concludes that the rational basis test is unquestionably met here. It should be emphasized that there was no testimony that any of the Plaintiffs have been involved in any criminal activity or that the Waterbury Chapter of the Outlaws has been involved in any criminal activity. So far as the Court was able to discern from the testimony at the hearing, Plaintiffs are all law-abiding citizens. Nonetheless, the Court believes that the DOC has sound reasons for not wanting its correctional officers to become members of or associate with groups such as the Outlaws that have been accused of criminal activity on a national basis and are known to have long-standing feuds with other groups that are present in the prison population, such as the Hell's Angels. As the NDIC information shows, the Outlaws are known as a criminal enterprise, at least nationally. Moreover, Officer Williams, a witness from the state police who specializes in motorcycle groups, testified that the Connecticut state police have the Waterbury Outlaws and three other 1% biker groups under surveillance and that state police expect that in time the Waterbury chapter of the Outlaws will become involved in violence and crime, as has occurred with other Outlaws' chapters. In fact, the Outlaws have been criminally prosecuted under the RICO statute in other states, and Deputy Commissioner Murphy testified that the Federal Bureau of Prisons has placed the Outlaws on its designated security risk list. Transcript at 75. Deputy Commissioner Murphy also testified that Connecticut has

had serious problems with gang violence in prisons in the recent past, and that DOC has undertaken new policies to reduce gang violence in prisons, including increased monitoring of gangs. *Id.* at 17–20. Finally, Officer Williams testified without contradiction that any state police officer who was known to associate with the Outlaws would be fired immediately. All of this information demonstrates to this Court the rationality of the DOC's concern about prison officials being members of or associated with the Outlaws. Accordingly, this Court finds that Plaintiffs have not raised serious questions going to the merits on their First Amendment expressive association claim.

If this Court is wrong in its conclusion that Plaintiffs' association with the Outlaws does not touch upon matters of public concern, Plaintiffs would be entitled to more heightened scrutiny of DOC's action than is provided by the rational basis test. Nevertheless, this Court finds that DOC would satisfy even that heightened standard in this case. The second step of the *Pickering* analysis requires the Court to balance free speech concerns and the government interest, and, for the government to win, it must "show that plaintiff's expression was likely to disrupt the government's activities, and that the likely disruption was sufficient to outweigh the value of the plaintiff's First Amendment expression." *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir.2003). In *Melzer*, the Second Circuit outlined a three-part test for evaluating the second stage of the *Pickering* analysis. 336 F.3d at 197.

First, a court must evaluate whether the speech (or association) in question is disruptive to internal operations of the governmental unit in question. The government has the burden of showing that the speech could "impede[ ] the performance of the speaker's duties or interfere[ ] with

the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). While there was no testimony that Plaintiffs' membership in the Outlaws had actually impeded work performance to date, Deputy Commissioner Murphy and Commissioner Lantz testified to many ways in which membership or association with a known gang could seriously disrupt prison operations and security. Their testimony, which was not rebutted, only confirmed what common sense itself would suggest.

A showing of probable future disruption can satisfy the balancing test. Indeed, in *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), the Supreme Court held that courts must give "substantial weight to government employers' reasonable predictions of disruption." *Id.* at 673, 114 S.Ct. 1878. Here, the testimony established that the Federal Bureau of Prisons has put the Outlaws on its security risk list and the state police expect the Waterbury Chapter of the Outlaws to become involved in criminal activity in Connecticut in the near future as a result of its rivalry with the Hell's Angels. In these circumstances, the DOC was entirely justified in relying on information from these law enforcement agencies in formulating its own decision-making regarding the safety and security concerns raised by Plaintiffs' association with the Outlaws.

The second component of the test focuses on the content of the disruptive speech. "The more the association in question centers around expressive activities relating to matters of public concern, the greater the government's burden to show disruption." *Melzer*, 336 F.3d at 197. Here, as noted above, the association in question does not at all touch on matters of public concern. As a result, the government's

burden of demonstrating disruption is quite low.

Finally, the nature of the employee's responsibilities and position can lessen the government employer's burden as well. "The level of protection afforded to an employee's activities will vary with the amount of authority and accountability the employee's position entails." *Id.* In this case, we are dealing with the prison system, a context in which courts regularly defer to the government. *See, e.g., Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Bell v. Wolfish,* 441 U.S. 520, 540 n. 23, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Insofar as the DOC's action was directed against correctional officers who have regular contact with the prison population and who nonetheless wish to associate with a group that is considered by law enforcement authorities to be a gang, the Court will give deference to DOC's judgment that such an association is not in the best interests of the correctional system.

Assessing these factors in the context of the evidence adduced on the motion for preliminary injunction, the Court is of the view that the balancing test tips in favor of the DOC in this case. In this regard, the Court notes that it does not agree with the analysis set forth in *Curle v. Ward,* 59 A.D.2d 286, 399 N.Y.S.2d 308 (N.Y.App. Div.1977) and urged on this Court by Plaintiffs. In *Curle,* the court held that a state correctional institution's directive prohibiting correctional officers from being members of the Ku Klux Klan was an unconstitutional violation of the employees' freedom of association under the First Amendment. The Court feels strongly that the dissent in that case (and in the New York Court of Appeals case upholding the decision, *Curle v. Ward,* 46 N.Y.2d 1049, 416 N.Y.S.2d 549, 389 N.E.2d 1070 (N.Y.1979)) has the better of that argument, as this Court, for one, believes that the majority in those decisions significantly understated and undervalued the state's interest in ensuring a safe prison environment. *See also Weicherding v. Riegel,* 981 F.Supp. 1143, 1147–48 (C.D.Ill.1997) (rejecting the *Curle* analysis).

**2. Intimate Association Claim.** In addition to asserting a violation of their First Amendment right to expressive association, Plaintiffs also claim that DOC's actions interfere with what they claim is a First Amendment right to intimate association. The Court concludes that Plaintiffs' intimate association claim is even weaker than their expressive association claim. Therefore, Plaintiffs have also failed to satisfy the serious question standard on the merits of their intimate association claim. In *Roberts v. United States Jaycees,* 468 U.S. 609, 620, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court held that in evaluating an intimate association claim, courts must consider the size and selectivity of the group and whether the group's activities are carried on in private or in public. In this case, there has been no testimony about the size of the Outlaws and no testimony about criteria for membership (although there apparently is a probation period for new members). Moreover, Plaintiffs testified that the Outlaws' activities are carried on in public on motorcycle rides or at parties that are open to the public. Indeed, every Plaintiff testified that all of the Outlaws' social events were open to the public and that anyone could attend so long as they purchased a ticket. *See, e.g.,* Transcript at 8. Plaintiff's own testimony, therefore, substantially weakens any claim of intimate association.

In *Montgomery v. Carr,* 101 F.3d 1117 (6th Cir.1996), the Sixth Circuit provided an extended analysis of the right to intimate association and determined in a somewhat analogous context that the as-

serted right occasioned only rational basis scrutiny. If anything, the claim of intimate association in this case is even weaker than that asserted in *Montgomery,* as the Outlaws' group of social friends would presumably be afforded even less protection than the familial group involved in *Montgomery.* Therefore, rational basis scrutiny is the most that would apply in this case. And, as noted above, the DOC can easily demonstrate a rational basis for its actions. *See also Ross v. Clayton County,* 173 F.3d 1305, 1311–12 (11th Cir. 1999).

In support of their claims, Plaintiffs invoke two cases that involve intimate association claims—*Wilson v. Taylor,* 733 F.2d 1539 (11th Cir.1984), and *Milligan v. Albertville City Bd. of Educ.,* 628 So.2d 625 (Ala.Civ.App.1993), which relies entirely on *Wilson.* However, *Wilson* was decided before the Supreme Court decided *Roberts,* and a number of courts have rightly held that *Wilson* did not survive *Roberts. See, e.g. Swank v. Smart,* 898 F.2d 1247, 1252 (7th Cir.1990). The Court declines to follow *Wilson* and its progeny in this case. Accordingly, the Court concludes that Plaintiffs have failed to demonstrate serious questions going to the merits on their claim of intimate association.

■ **3. Overbreadth Claim.** Plaintiffs also assert a void for vagueness challenge to A.D. 2.17 as applied to them, effectively making what is considered in the First Amendment context to be an overbreadth challenge. Plaintiffs' challenge is not a facial challenge to the directive but only an as applied challenge. They point to the indeterminate language of the directive and argue that they had no notice that associating with the Outlaws would violate the directive's broadly worded prohibitions. The Supreme Court has stated that a law is not impermissibly vague simply because it "requires a person to conform his conduct to an imprecise but compre-

hensible normative standard," *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), and the Court has upheld regulations containing language similar to that found in AD 2.17, such as a prohibition on "conduct unbecoming an officer." *Parker v. Levy,* 417 U.S. 733, 752–61, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *see also Perez v. Hoblock,* 248 F.Supp.2d 189, 199 (S.D.N.Y.2002) (upholding against vagueness challenge a fine imposed under a New York State Racing and Wagering Board regulation prohibiting "any action detrimental to the interests of racing generally"). The directive at issue here, AD 2.17, prohibits, among other things, engaging in conduct that constitutes or gives rise to the appearance of a conflict of interest, engaging in unprofessional or illegal behavior that could reflect negatively on the DOC, and acting in ways that jeopardize the security of the unit, or the health, safety, or welfare of the public staff or inmates. AD 2.17 is thus analogous to the regulations challenged in the aforementioned decisions, each of which rejected an overbreadth claim. Accordingly, the Court concludes that Plaintiffs have failed to raise serious questions as to overbreadth of AD 2.17 as applied to their conduct.

■ **4. Equal Protection Claim.** Finally, Plaintiffs assert that DOC's actions violate their rights to Equal Protection under the Fourteenth Amendment. However, the only Equal Protection claim asserted at this point relates to what Plaintiffs claim is, in effect, selective prosecution or disparate treatment in their discipline. In *Cobb,* the Second Circuit held that such a claim requires a showing that: (1) the plaintiffs were treated differently from other similarly situated individuals and (2) such differential treatment was based on, among other things, exercise of a constitutional right.

*Cobb,* 363 F.3d at 110. Assuming Plaintiffs can make the latter showing, they certainly have not made the former, as they have as yet presented no evidence that there exists anyone who is similarly situated to them.

■ It is entirely possible that Plaintiffs' Equal Protection claim will be further developed or altered as the litigation proceeds. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (allowing for "class of one" equal protection claim). As it stands now, however, Plaintiffs cannot demonstrate serious questions going to the merits of their Equal Protection claim sufficient to warrant issuance of a preliminary injunction against DOC.

### D. Balance of Interests

Based on the analysis set forth above, it should be apparent that the Court also concludes that the balance of hardships does not tip decidedly in favor of Plaintiffs. The Court does not doubt for a moment the hardship and emotional pain of losing a job, particularly for individuals like Plaintiffs who have served their state so well for so long. However, given the strong interests that ordinarily favor the State in cases such as this and the even stronger interests that apply in the prison context, the Court cannot find for Plaintiffs on this issue.

The Court notes that Plaintiffs may well be able to present a viable claim in their grievance/arbitration proceedings. Among other things, the fact that several of the Plaintiffs expressly asked three of their superiors about their association with the Outlaws and were told that such an association was not a problem so long as they did not engage in criminal activity themselves, suggests that an arbitrator may well conclude that their firing was problematic under labor-management norms, policies, or procedures. Also, there was some testimony at the hearing, albeit of a generalized nature, that Plaintiffs received more severe discipline than was given other correctional officers who had been found to have been less than truthful in other contexts. However, these issues are not matters for this Court on this motion for preliminary injunction, which is focused entirely on constitutional claims. As the Supreme Court has noted, "[p]erhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684.

Accordingly, Plaintiffs' Motion for Preliminary Injunction [doc. # 4] is DENIED. As the Court made clear in issuing its oral ruling, barring an immediate appeal to the Second Circuit, this Court is prepared to set this case down for expedited discovery and a prompt trial on Plaintiffs' claims. The Court will hold a scheduling conference with counsel on **May 21, 2004** at 9:30 a.m.

IT IS SO ORDERED.